UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION, <br><br> Plaintiff, <br><br> v. <br><br> JAMES HARVEY MASON, <br><br> Defendant, and <br><br> THE JHM FOREX ONLY POOL (f/k/a THE JHM FOREX ONLY POOL, LP), and FOREX TRADING AT HOME, <br><br> Relief Defendants. | CASE NO. 3:13-CV-196-GCM |

## ORDER APPROVING RECEIVER'S RECOMMENDATIONS REGARDING CLAIMS

**THIS MATTER** is before the Court in consideration of the Receiver's Report of Claims, Objections to Claims, and Recommendations Regarding Claims (Doc. No. 139) and brief in support (Doc. No. 140), as well as certain claimants' limited objections to the report (Doc. No. 147) and the Receiver's reply to those objections (Doc. No. 151). The Court finds that it has jurisdiction over this matter and that notice was proper.

### I. BACKGROUND

On March 27, 2013, the U.S. Commodity Futures Trading Commission ("CFTC") filed the civil Complaint in this case (Doc. No. 1) against James Harvey Mason as Defendant and The JHM Forex Only Pool (f/k/a The JHM Forex Only Pool, LP) and Forex Trading At Home as Relief Defendants. On that same day, the Court entered a Statutory Restraining Order (Doc. No.

11) imposing a temporary injunction and appointing the Receiver. The Receiver was directed to take custody, control, and possession of all funds, property, and other assets in the possession or control of the Defendants and to perform all acts necessary to hold, manage, and preserve the value of such assets. On May 22, 2013, the Court entered an Order of Preliminary Injunction (Doc. No. 22) creating a preliminary injunction and confirming the appointment and the powers and duties of the Receiver. Since that time, the Receiver has worked diligently and efficiently to marshal the Receivership assets and otherwise appropriately administer the Receivership estate.

On August 5, 2014, the Receiver filed a motion seeking approval of proposed claims verification and notice procedures, as well as a proposed claims distribution method and distribution procedure (Doc. No. 86). On September 2, 2014, the Court approved the proposed claims verification and notice procedures (Doc. No. 94) and set a hearing date for the issues raised by the proposed distribution procedure (Doc. No. 95). The Court conducted that hearing on October 14, 2014 and ordered that the Receiver's proposed "rising tide" distribution method be employed in this case (Doc. No. 107). Based on an objection filed by Walter T. Krantz purporting to have some sort of security interest in Receivership assets (Doc. No. 92), the Court ordered on October 22, 2014 that any party asserting a security interest in, or any other right to a priority in payment from, assets collected by the Receiver in this case must file a pleading with the Court asserting such interest on or before December 1, 2014 (Doc. No. 112). Several such claims were subsequently filed (Doc. Nos. 121, 122, 123, 124, & 125).

In accordance with the claims procedure order, the Receiver shows that he has sent documentation to all known mailing and email addresses of potential customers of the Defendants detailing the claims procedure in this case and informing them of the claims bar date. The Receiver also sent customers a claims spreadsheet proposing total amounts of contributions

2

and withdrawals as to each customer. Customers who disagreed with the figures compiled by the Receiver in the claims spreadsheet were required to submit documentation supporting any purported inaccuracies, and the Receiver then worked to resolve purported inaccuracies with the customers. The Receiver shows that all such inaccuracies were resolved with the exception of claims submitted by Robert G. Drumwright, Carol V. Falls and Ralph Falls, as Trustee for Rennie Falls (the "Falls"), and the aforementioned claimants asserting a security interest in the receivership assets ("Secured Claimants").[1] As to Mr. Drumwright, the Receiver notes his belief that grounds exist to object to this claim based on Mr. Drumwright's close relationship to Mason and the fact that the claim was submitted late; however, the Receiver does not believe that litigating this objection is in the best interests of the Receivership. Therefore, the Court will proceed to resolve the Falls claim and those of the Secured Claimants.

## II. DISCUSSION

### A. Falls Claim

The Receiver moves to disallow the Falls claim based on apparent discrepancies between the records discovered by the Receiver and the assertions made by the Falls. Indeed, the Falls appear to assert a claim totaling $41,331.22,[2] alleging three contributions to Defendants and no distributions.[3] During its investigation of Defendants' records, however, the Receiver discovered several payments made to the Falls which were either mischaracterized by the Falls or were not disclosed altogether. (*See* Doc. No. 139-5 (reflecting a payment of $2,500); Doc. No. 139-6 (reflecting a payment of $35,000); Doc. No. 139-8 (reflecting a payment of $15,000)). When the

---

[1] For ease of reference, the Court refers to the parties claiming a security interest in the assets of the Receiver as "Secured Claimants," and their claims as "Secured Claims."

[2] (*See* Doc. No. 139-3). When the alleged payments listed in the Falls' claim are correctly added, the claim actually totals $44,851.22.

[3] The Falls base this claim partially on amounts listed in trading reports that were disseminated to customers at the height of Defendants' trading scheme—reports the Receiver believes to be unreliable. Otherwise, the Falls do not appear to offer any independent credible backup information to support these claimed contributions.

3

documented contributions and distributions are added, it appears that the Falls actually contributed some $22,896.25 to Defendants, and received distributions totaling some $52,500, such that the Falls appear to be net winners by $29,603.75. (*See* Doc. No. 139 at 8). Based on these figures, and the apparent misrepresentations made to the Receiver by the Falls, "the Receiver does not find credible any representation from the Falls not backed up with independent evidence, such as bank account documents." (Doc. No. 139 at 11).

The Court agrees. It appears that the information offered by the Falls is in direct conflict with the records discovered by the Receiver, and that the Falls have made misrepresentations to the Receiver about the amount, frequency, and nature of the payments they received from Defendants. As such, the Court finds that the Falls' claim is unsupportable and it will be disallowed.

**B. Secured Claims**

As noted *supra*, a number of individuals seek priority payment from the Receivership based on a purported Security Agreement executed by Defendants in their favor.[4] This agreement accompanied a so-called "Private Placement Offering" ("PPO") whereby customers purchased "units" in "senior secured notes" bearing an interest rate of 12% per annum plus a "success fee" of up to 49% of JHM's profits or earnings from FOREX trading and other activities conducted by Defendants. (*See, e.g.*, Doc. No. 121 at 4-11). The PPO also provides that the units would be secured by certain assets and property of Defendants, and that JHM would "establish an escrow account to act as a clearing account for the receipt of funds directed to the purchase of Units." (Doc. No. 140-6 at 1, 5). Per the terms of the PPO, Mason's accountant—Bob Drumwright—

---

[4] These individuals are Nancy Fairly (Doc. No. 121); M. Everett Smith (Doc. No. 122); Gail J. Spires (Doc. No. 123); Katherine C. Moreland (Doc. No. 124); Mark Chandler (Doc. No. 125); Ashton Chandler (Doc. No. 125); William H. Gilbert (Doc. No. 125); and Courtney A. Chandler (Doc. No. 125).

would serve as the escrow agent for said account, and was obligated to deliver the purchase money to JHM "[i]mmediately upon clearing." (*Id.*)

The actual Security Agreement associated with the PPO appears to grant Drumright, as "Escrow Agent of [JHM] on behalf of the purchasers of Units issued by [JHM] through [the PPO]," a security interest in the "[p]roperty, equipment, current and future cash receipts, chattels, accounts receivable of JHM Holdings, LLC, Debtor and/or its Manager, James H. Mason, Debtor." (*Id.* at 12). The "Assignment," which appears immediately after the signature page of the Security Agreement, has Drumwright assigning all of his interest as the "Secured Party" under the Security Agreement to purchasers of units pursuant to the PPO. (*Id.* at 17). It is these documents which Secured Claimants argue entitle them to a security interest in the assets of the Receivership.

Both parties correctly note that a federal equity receiver "takes property subject to all liens, priorities, or privileges existing or accruing under the laws of the state." *See Marshall v. People of State of New York*, 254 U.S. 380, 385 (1920). A court supervising a federal equity receivership "must respect contract rights" which "cannot be affected by the [principle] of equality of distribution." *S.E.C. v. Mgmt. Solutions, Inc.*, No. 2:11-cv-1165-BSJ, 2013 WL 594738, at *3 (D. Utah Feb. 15, 2013) (quoting *Ticonic Nat'l Bank v. Sprague*, 303 U.S. 406, 412 (1938)).

Acknowledging that he stands in the shoes of Defendants and the Estate, the Receiver argues that the Security Agreement at issue in this case, by its express terms, does not secure the obligations underlying the Secured Claims at issue here. Instead, the Security Agreement grants Bob Drumwright as "Escrow Agent" a security interest in JHM's and Mason's property to secure payment of "obligations and liabilities of [JHM] to Secured Party," i.e. Drumwright. (Doc. No.

5

140-6 at 12). The Security Agreement, then, does not secure any obligations to the Secured Claimants in this case; rather, it grants a security interest to Drumwright for any obligations and liabilities owed to Drumwright. Further, there does not appear to be any evidence that Drumwright acted as an agent for, or otherwise represented, the Secured Claimants in executing the Security Agreement such that these Secured Claimants could be considered a "Secured Party" per the terms of the agreement. This result is the same despite the Assignment accompanying the agreement, because that Assignment only assigns *Drumwright's* interest as the "Secured Party" under the Security Agreement to the purchasers of units. (*See id.* at 17). Absent some evidence that that Drumwright assigned some other debt owed to him by Defendants, the Assignment is meaningless. *See Carpenter v. Longan*, 83 U.S. 271, 274 (1872) (recognizing that an "assignment of the note carries the mortgage with it, while an assignment of the latter alone is a nullity"). Finally, the Receiver notes that, even if the Secured Claimants held a valid security interest in Defendants' assets, those claims would be subordinate to the Receiver's because they were unperfected at the time of the Receiver's appointment on March 27, 2013. *See* N.C. Gen. Stat. § 25-9-317(a)(2) (unperfected security interests are subordinate to the rights of a person who earlier becomes a lien creditor); § 25-9-102(a)(52)(d) (including a "receiver in equity from the time of appointment" as a "lien creditor"). Indeed, there is no evidence that any of the Secured Claimants filed deeds of trust or financing statements, nor took possession or control of any of the assets in question, before March 27, 2013.

In their Memorandum in Support of the Limited Objection to the Claims Report (Doc. No. 147), the Secured Claimants appear to back away from their claim that they hold a valid security interest in the assets of the Receiver. They do, however, assert that they have an "equitable claim" to some $52,985.00 which the Receiver seized from a bank account belonging

to Drumwright. The account in question appears to have been established in Drumwright's name in connection with the PPO; Secured Claimants argue that this account is an escrow account and that Drumwright served as a fiduciary for those funds. The Receiver counters that the account was actually established as an "individual/sole proprietor" account rather than an escrow account, and that the signatories on the account were Mason, Brandon York (Mason's ex-stepson), and Drumwright. (*See* Doc. No. 151-2 at 8). Moreover, per the terms of the PPO itself, Drumwright's only obligation in this transaction was to allow the funds from unit purchasers to clear and to deliver those funds to JHM, an entity controlled by Mason. Drumwright was under no obligation to hold the funds or obtain any additional consent from unit purchasers prior to delivering the funds to Defendants, and otherwise had no fiduciary obligation to Secured Claimants in this matter.

To the extent that Secured Claimants argue that equity favors granting them priority as to the $52,985.00 seized from the Drumwright account, the Receiver notes that "Mason provided many false assurances to all Customers—not only the Secured Claimants—that investments and the resulting profits allegedly earned were 'secured,' 'backed' and/or 'guaranteed.' Mason failed to honor these promises to all Customers, Unit purchasers and pool investors alike, such that all Customers are similarly-situated as a matter of equity." (Doc. No. 151 at 4). The Court agrees once more with the Receiver. Secured Claimants have failed to demonstrate that they hold a valid security interest in any Receivership assets, and have failed to demonstrate that they are otherwise entitled to priority treatment with respect to those assets. Regardless of whatever fraudulent assurances Mason made to these claimants, the fact remains—all of Defendants' customers were duped into investing in a Ponzi scheme by Mason's wild, unsupportable promises. Indeed, "[i]t would be a costly, time-consuming challenging, and ultimately arbitrary

endeavor for the Court to parse which of Mason's empty promises should be enforced and which should be ignored." (Doc. No. 140 at 15).

For these reasons, the Court finds that "Secured Claimants" (*see supra* n.4) in this matter have failed to demonstrate a valid security interest in Receivership assets, and otherwise have not demonstrated that they are entitled to priority treatment. Those claims are disallowed to the extent they seek priority treatment; the Court will instead treat them as general claims.

### III. ORDER

**IT IS, THEREFORE, ORDERED** that the treatment of claims proposed in the Claims Report (Doc. No. 139) is **APPROVED** as follows:

(a)  All customer accounts and/or claims that the Receiver proposes to "Allow"—as shown on the attached Exhibit—are hereby ALLOWED as general unsecured claims against the receivership estate according to the total contribution and total distribution amounts listed on the attached Exhibit;

(b)  All customer accounts and/or claims that the Receiver proposes to "Deny"—as shown on the attached Exhibit—are hereby DISALLOWED and shall receive no distribution from assets of the receivership estate; and

(c)  All other customer accounts and/or claims that do not appear on the attached Exhibit are hereby DISALLOWED and shall receive no distribution from assets of the receivership estate.

**SO ORDERED** this 16th day of June, 2015.

*Graham C. Mullen*

Senior U.S. District Court Judge